Mrs. Flora I. JOHNSON, Clarence G. Johnson, and Hal W. Johnson, Plaintiffs,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Defendant.

Civ. A. No. 1275.

United States District Court
S. D. Texas,
Brownsville Division.

March 1, 1960.

Fulbright, Crooker, Freeman, Bates & Jaworski, Charles W. Hall, William M. Ryan, and C. W. Wellen, Houston, Tex., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Myron C. Baum, Garry A. Pearson, and Robert L. Littenberg, Attys., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., and Arthur L. Moller, Asst. U. S. Atty., Houston, Tex., for defendant.

INGRAHAM, District Judge.

Action for refund of taxes. The case concerns whether or not plaintiffs are entitled to the 27½% depletion allowance provided by Title 26 U.S.C. §§ 611 and 613, with respect to payments received by them under an oil and gas lease. The question is submitted for judgment upon stipulated facts and upon the briefs of the parties, following oral argument.

The controlling facts, as stipulated and shown by the lease in question, may be summarized as follows:

On July 26, 1952, plaintiff taxpayer, Mrs. Flora I. Johnson, acting on behalf of herself and the other plaintiffs, executed an oil and gas lease with the Superior Oil Company as lessee, covering an 8,165.64-acre tract of land owned by plaintiffs in Hidalgo County, Texas.

The lease was for a primary term of five years from the date thereof, July 26, 1952, and "as long thereafter as oil, gas or other mineral is produced in paying quantities thereunder from said land by Lessee, its successors or assigns, subject to the further provisions hereof." The tax years 1954, 1955 and 1956 for which refunds for depletion are claimed fall entirely within the primary term, which expired on July 26, 1957.

During the primary term, between April 1953 and January 1954, four gas wells capable of producing gas in paying quantities were completed on plaintiffs' land. There was no gas pipe line, however, to which any of these wells could be connected. All four were shut in by January 25, 1954, for lack of a satisfactory market. If any well is shut in for lack of a satisfactory market, Section 13 of the lease provides that the ninety-day period within which the next well is to be commenced shall not begin to run as long as the well is shut in. That section further provides that the lease shall terminate, except as to 320 acres around each shut-in gas well that is capable of producing gas in paying quantities, "unless continued in force under some other provision hereof." Thus the provisions of Section 13 for the continued development of the lease, while wells were shut in, were suspended, and, at least as to 320 acres selected by the lessee around each shut-in gas well, the lease did not terminate for lack of development under that section.

If a well is shut in, Section 16 of the lease provides that the lease may be continued in force beyond the expiration of the primary term as long as such well may be shut in, "provided Lessee exercises all reasonable diligence to obtain a market for such production * * *." A proviso indicates, however, that the lessee shall not have the right to continue the lease in force, except as to 320 acres that it may select around each shut-in gas well, unless a specified rental is paid within ninety days after the last such well is shut in and continued annually on or before such date during the shut-in period. The specified "rental" is $5 per acre for each acre contained in the lease and not selected by the lessee as excepted acreage around a shut-in gas well. Regarding the 320 acres selected by the lessee around each shut-in well, the lease specifies that a royalty of $5 be paid for each acre so selected, payable annually during the shut-in period within the time specified for payment of the rentals discussed above.[1]

On April 25, 1954, ninety days after the four wells had been shut in, Superior Oil Company made total payments of approximately $40,828.20 ($5 per acre for 8,165.64 acres) to plaintiffs, thereby exercising its right to make rental and royalty payments as to the entire acreage under Section 16. Like payments of $40,828.20 have been made on April 25 of each of the succeeding years in question.

Section 5 of the lease provides for the privilege of deferring commencement of drilling operations. The delay rentals provided therein are to be paid on or before July 26 of each year during the primary term. Since April 25, 1954, after the four gas wells were shut in, no payments other than the $40,828.20 paid annually under Section 16 have been made.

In reporting their income for the taxable years 1954 through 1956 plaintiffs did not claim deductions for depletion with respect to the payments received from Superior Oil Company. Subsequently, refund claims were filed by plaintiffs on the basis that these payments were subject to percentage depletion. On August 27, 1958, said claims for refund were denied. This action was timely filed on September 25, 1958. The alleged overpayment of income taxes totals $13,494.63, plus interest, for the years 1954, 1955 and 1956.

Plaintiffs contend that all the payments under Section 16, whether termed "royalty" or "rental", are "shut-in royalty" payments on which they are entitled to the 27½% depletion allowance. Claiming that for tax purposes the names given the payments are not controlling,

[1]. Section 16: If at the expiration of the primary term hereof, or at any time or times thereafter, there is any well on said land, capable of producing oil or gas, but which may be shut in due to a lack of a satisfactory market, this lease shall, nevertheless, continue in force as though operations were being conducted on said land as long as any such well or wells may be shut in, and thereafter, this lease may be continued in force as if no shut-in had occurred, provided Lessee exercises all reasonable diligence to obtain a market for such production, but in the exercise of such diligence, shall not be obligated to construct plants, pipe lines, or other facilities off the leased premises, or to settle labor disputes, or to market gas on terms considered to be below the fair market value of same. Provided further, that Lessee shall not have the right to continue this lease in force, except as to 40 acres around each oil well and 320 acres around each gas well, capable of producing oil or gas in paying quantities, to be selected by Lessee in the manner above provided, unless within 90 days after the last such well is shut in, Lessee shall pay or tender to Lessor the Five ($5.00) Dollars per acre rental provided herein on that portion of the acreage not selected by Lessee around an oil or gas well, and likewise thereafter, annually, on or before such date, pay or tender said rentals, during such shut-in period.

"Lessee shall also, annually, during such shut-in period, and within the time specified above for payment or tender of rentals, pay Lessor, as royalty, Five ($5.00) Dollars per acre for each acre selected by Lessee around each oil or gas well so shut in."

they maintain that the payments must be construed for what they are, namely shut-in royalties rather than delay rentals. They argue that the payments are not delay rentals because there is nothing left to delay. Delay rentals, they say, are not present or advance payments on oil or gas but are payments for additional time to utilize the leased land. When there has already been successful drilling activity, only royalties are paid. Concluding that shut-in royalties are royalties under Texas law, they further contend that such royalties are depletable under Title 26 U.S.C. § 613. They would show that allowance of depletion does not depend upon actual production of oil or gas under Section 613 but is a percentage of the gross income from the property. They depend upon the principle that a bonus payment is considered to be an "advance royalty" and an additional consideration for the lease over and above the usual royalty, thereby being ordinary income and subject to depletion. A shut-in royalty, they maintain, has similar characteristics to a bonus and therefore should be depletable because it is an advance share of the oil or gas, because it does not depend upon actual extraction of the mineral, and because it may never be recouped by the lessee.

Defendant contends that the payments with respect to the 320 acres selected around each of the shut-in gas wells may be shut-in royalties but that the payments termed rentals for the remainder of the acreage are rentals. Since the lessee completed four gas wells capable of producing gas in paying quantities, defendant maintains that the maximum annual payment under the shut-in royalty clause, as such, would be $5 per acre for 1,280 acres (four times 320 acres) or $6,400. The remainder of the payments would be considered rentals and not depletable as shut-in royalties. Denying any contention that any of the payments are technically delay rentals, designed to delay termination of the lease and to permit further exploration and drilling, defendant claims that these payments are in the nature of rentals, since

they delay total expiration of the lease, do not depend upon the finding or production of oil or gas, and do not exhaust any amount of the minerals in the soil. Defendant further contends that the payments are not depletable under Title 26 U.S.C. § 613. Since the payments were not to compensate plaintiffs for a loss of capital through the production of oil and gas, he argues that the deduction must be denied. He denies that a shut-in royalty has similar characteristics to a bonus and therefore should be depletable, pointing out that the shut-in royalty is intended to delay production of oil and gas, not to increase payments to the lessor for eventual production. A shut-in royalty, he says, is similar to a rental, since both are intended to delay, rather than to pay for, the actual production of oil and gas.

The court will first consider the characterization of these payments as royalty or rental in terms of the lease and Texas law. The definitions of the basic interests established by Texas oil and gas law are as follows. A royalty is the share of the product or profit reserved by the landowner for permitting the lessee to enter his land and appropriate the minerals, 31–A, Texas Jurisprudence, Section 475. A bonus is the amount paid as an additional consideration for a lease of mineral lands over and above the usual royalty. It is in the nature of an advance royalty. 31–A, Tex.Jur., Secs. 475–476. A delay rental, on the other hand, is not paid for the oil produced but is simply a payment for additional time to utilize the land. It accrues by the mere lapse of time like any other rent. Usually a delay rental is payable to postpone only the drilling of the first producing well on the tract. 31–A Tex.Jur., Sec. 479.

■ The shut-in payment is a relatively recent innovation intended usually to avoid termination of the lease where, for a number of reasons, producing wells must cease production and where the delay rental clause is inapplicable. See Wallace Gordon Malone, "The Evolution of Shut-In Royalty Law," XI Baylor Law

Review (Winter, 1959, No. 1) pg. 19, et seq. This article indicates that scriveners in the oil and gas field do not lack originality in creating new property or contract interests to balance the interests of lessors and lessees. Depending upon the particular lease, a shut-in payment may partake of the character of royalty or rental, as will be shown in the following analysis.

The essence of a royalty is its relation to the production of oil or gas, as a present, advance, minimum, or substitute payment therefor. Construction of royalty provisions though has led further and further away from the requirement of present or probable production. Royalty is the primary consideration for granting the lease and is considered compensation for a sale of the minerals in place. Since the mineral rights are sold for a specified period and under the terms of a particular lease, the lessor usually retains only the right to receive royalty payments. His remedy for the failure of the lessee to make such payments normally is a breach of contract action, not termination of the lease and recovery of the right to extract the minerals.

The crux of a rental is that it continues the interest vested in the lessee and delays forfeiture of the lessee's rights and their reversion to the lessor. Rental is no part of the consideration for granting the lease; rather, it is a mere compensation to the lessor for the lessee's privilege of deferring performance of the obligations of the grant. The lessor's remedy for the failure of the lessee to pay rental normally is termination of the lease and recovery of the right to extract the minerals.

If failure to make a shut-in payment does not result in termination of the lease, the sale of the minerals in place is still in effect. If the right to extract the minerals still belongs to the lessor, the shut-in payment in lieu of production should be considered as royalty and part of the bargained consideration for granting the lease. If failure to make a shut-

in payment does result in termination of the lease, the sale of the minerals in place can no longer be considered effective. If the right to extract the minerals would otherwise revert to the lessor upon failure to make a shut-in payment, said payment has no relation to production of minerals by the lessee and should be considered rental for the privilege of delaying forfeiture of the lease and performance of the obligations of the grant.

These conclusions are not inconsistent with Morriss v. First Nat. Bank of Mission, Tex.Civ.App. San Antonio, 1952, 249 S.W.2d 269, writ ref. n. r. e., cited by plaintiffs. In that case the court held that a minimum royalty provided during a shut-in period was a royalty, rather than a delay rental, under the terms of the lease. Under another provision of the lease, not in question on appeal, the lease was continued throughout a shut-in period. Under Paragraph 14, the provision in question, a minimum royalty was provided, while Paragraph 4 specified a delay rental. The question was whether the payments under Paragraph 14 belonged to the royalty owners or to the owner of the rentals and bonus. The court was faced with a choice of two alternatives in characterizing the payment under Paragraph 14: royalty or delay rental. Since failure to pay the minimum royalty provided in that paragraph would not result in forfeiture, the court held that the payment was a royalty and not a delay rental, because there was nothing under Paragraph 14 to be delayed. The court was not faced with the situation in the case at bar: a shut-in payment, termed a "rental", payment of which might avoid termination of the lease as to the property covered.

On the other hand, the Morriss case is authority for holding that the shut-in royalty payment in the case at bar, namely, $5 per acre for each of the 320 acres selected by the lessee around each shut-in gas well, is a minimum or substitute royalty under Texas law. The spirit of the Morriss opinion, expressed in the following quotation, is equally applicable to the case at bar:

" * * * To restrict judicially the terms of leases or contracts to that which is usual is a far-reaching legal proposition which ignores important elements of change, competition, demand, circumstance, the creativeness of the oil industry and the law profession and the freedom to contract. To interpret intent by what is usual is one thing, but to interdict the power to contract by what is usual is another." Morriss, supra, at page 277.

The court believes that the basic difference between royalties and rentals lies in the power of the rental alone to delay forfeiture or termination of the lease by payment and mere lapse of time. To determine whether the payments provided by Section 16 of the lease in question are royalties or rentals, one must examine the means by which the lease may be forfeited as to various classifications of acreage thereunder.

The two classes of acreage for which payments are provided under Section 16 are the 320 acres around each shut-in gas well selected by the lessee and the remainder of the acreage contained in the lease. How does the lease provide for the forfeiture or termination of the lessee's rights in these classes of acreage? As to the remainder of the acreage, it is clear from Section 16 that the lease would terminate with relation to said acreage if the specified rental was not paid annually within the stated time limit.

■ Regarding the 320 acres selected around each shut-in gas well, there is no provision that failure to pay the specified royalty would result in forfeiture or termination of the lease. The lease was for a primary term of five years and as long thereafter as oil, gas or other mineral is produced in paying quantities therefrom, subject to the further provisions of the lease. If any well is shut in for lack of a satisfactory market, Section 13 suspends the provisions for continued development of the lease and specifies that the lease will not terminate as to

320 acres around each shut-in well selected by the lesseee. Further, Section 16 states that the lease may be continued in force beyond the expiration of the primary period as long as any well may be shut in, provided the lessee exercises all reasonable diligence to obtain a market for such production. That section continues to except the 320 acres that the lessee may select around each shut-in gas well from the termination provision applicable to the remaining acreage. The effect of these references to the selected 320 acres around each shut-in gas well is to permit forfeiture or termination of the lease as to this class of acreage to rest on the diligence of the lessee in obtaining a market for such production, rather than upon payment or non-payment of shut-in royalty.

■ Since payment of the specified rental is the sole means by which termination of the lease as to the remaining acreage can be avoided, it is obvious that said payment is a rental in terms of the lease. Because payment of the shut-in royalty is not necessary to prevent termination of the lease as to the acreage covered thereby, said payment is a royalty in terms of the lease. As shown by the discussion above, there is no basis in logic or Texas law to prevent the creation of such legal interests. It cannot be contended that the payment of royalties and rentals as to different classes of acreage under Section 16 is precluded by the general rule of Young v. Rudd, Tex. Civ.App.Texarkana, 1950, 226 S.W.2d 469, writ ref. n. r. e., which held that a lessor cannot receive both royalty and rental under the same lease at the same time. This appears to be a general rule of construction, expressing the usual intention of parties to an oil and gas lease. The principle does not apply to the case at bar, because the parties expressly provided for royalties and rentals as to different classes of acreage under Section 16 and no conflict would arise between payment of these sums. Depending upon its function in the lease, a shut-in payment may just as easily be termed "shut-in rental" as "shut-in royalty".

The court will now consider the eligibility of these shut-in payments for the depletion allowance provided by Title 26 U.S.C. §§ 611 and 613. Section 611 permits a reasonable allowance for depletion as a deduction in computing taxable income in the case of mines, oil and gas wells, other natural deposits, and timber. Section 613 reads as follows:

"§ 613. Percentage depletion

"(a) General rule.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

"(b) Percentage depletion rates. —The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

"(1) 27½ percent—oil and gas wells."

The question involves the eligibility for depletion of two types of interests under the lease and Texas law: a royalty and a rental. Though Texas law does not control depletion under the federal income tax law, it is relevant in ascertaining the nature of the payments in question. As has been held many times, "The state law creates the legal interests, but the federal statute determines when and how they will be taxed." Burnet v. Harmel, 1932, 287 U.S. 103, at page 110, 53 S.Ct. 74, at page 77, 77 L.Ed. 199.

Since the rental to hold the remaining acreage is held to be a rental under state law and since the parties do not contend that a payment in the nature of a rental is entitled to depletion under the federal income tax law, the court considers that there is no question of the eligibility of the rental for percentage depletion. The point in issue is whether the shut-in royalty for the 320 acres to be selected around each shut-in gas well is entitled to the depletion allowance under Section 613.

The court believes that plaintiffs are entitled to the depletion allowance with respect to the shut-in royalty payments. It is established that these payments are not in the nature of rentals, because they do not delay forfeiture or termination of the lease. This shut-in royalty has the effect of a minimum or substitute payment in lieu of production. It has the result of spreading the income or consideration out over the entire period of the lease to avoid interruption of payments through stoppage of production.

It is established that a royalty is entitled to the depletion allowance and that a bonus, being in the nature of an advance royalty, is also so entitled. Burnet v. Harmel, supra; Murphy Oil Co. v. Burnet, 1932, 287 U.S. 299, at page 302, 53 S.Ct. 161, at page 162, 77 L.Ed. 318; Palmer v. Bender, 1933, 287 U.S. 551, at page 559, 53 S.Ct. 225, at page 227, 77 L.Ed. 489. These cases reflect the attitude of the Supreme Court that the right to depletion is not conditioned upon the actual or present extraction of oil or gas.

Furthermore, Section 613 provides that "the allowance for depletion * * shall be the percentage * * * of the gross income from the property." The gross income from the property is the important consideration, not the actual production of gas. As was stated in Herring v. Commissioner, 1934, 293 U.S. 322, at pages 324–328, 55 S.Ct. 179, at pages 180–181, 79 L.Ed. 389:

"A bonus is not proceeds from the sale of property, but payment in advance for oil and gas to be extracted, and is therefore taxable income. As such it is a part of the

'gross income from the property' as the phrase is used in Section 204(c) (2) to designate the base for the application of the percentage deduction." 293 U.S. at page 324, 55 S.Ct. at page 180.

"It has never been held here that the existence of a well conditioned the right to depletion." 293 U.S. at pages 325–326, 55 S.Ct. at page 180.

"To condition the allowance on actual production, however small, or the imminent probability of production, and to deal in refinements as to the degree of probability of future production is in many cases to deny any deduction whether the taxpayer elects to compute it under 204(c) (2), (flat percentage of gross income from the property) and permit it where he elects to compute it under 204(c) (on the basis of cost). But the nature and the purpose of the allowance is the same in both cases, and we find neither statutory authority nor logical justification for withholding it in the one and granting it in the other; much less for making the decision turn upon the circumstance that no production is obtained within the year in which the bonus is paid." 293 U.S. at pages 327–328, 55 S.Ct. at page 181.

Depletion of a bonus is not conditioned upon the actual or present extraction of oil or gas, because the bonus is usually paid at the time of execution of the lease, well in advance of any drilling or production. That a bonus is considered an advance royalty, though no production has taken place, indicates that the Supreme Court would hold shut-in payments to be entitled to depletion where they bear some relation to later production and are not in the nature of rentals. It would appear that the court should consider as depletable a shut-in payment resulting in the spread of income or consideration over the entire period of the lease to avoid interruption of payments through stoppage of production. Such minimum or substitute payments are as eligible as bonuses for depletion, if they do not have the effect of delaying forfeiture or termination of the lease.

Plaintiffs are entitled to the 27½% depletion allowance with respect to the shut-in royalty payments covering the 320 acres selected around each shut-in gas well but not regarding the shut-in rental payments covering the remaining acreage. They will be allowed to deplete the sum of $6,400 for each of the tax years in question on the basis of $5 per acre for 1,280 acres per year. The clerk will notify counsel to draft and submit judgment accordingly.